# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 13, 2018

Plaintiff-Appellee,

v

No. 336111
Tuscola Circuit Court
LC No. 15-013573-FH

BILLY ROY FRITZ,

Defendant-Appellant.

Before: TALBOT, C.J., and METER and TUKEL, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of larceny by false pretenses (value of $50,000 or more but less than $100,000), MCL 750.218(6)(a), and being an unlicensed residential builder, MCL 339.601(6). Defendant was sentenced as a third-offense habitual offender, MCL 769.11, to 17 to 30 years' imprisonment for the conviction of larceny by false pretenses. He was sentenced to 43 days in jail for the remaining conviction and was also ordered to pay restitution in the amount of $114,832.36. We affirm.

This appeal arose from defendant's systematic defrauding of 86-year-old Virginia Batterbee. During a period of only seven months, he obtained over $114,000 from her under the guise of performing home repairs. At first, Batterbee employed defendant to do some minor yardwork. After that, defendant talked Batterbee into hiring him to repair a segment of her roof. Following that, defendant fostered a personal relationship with Batterbee and continued to find odd jobs around Batterbee's home that he insisted needed to be performed. Batterbee was unable to observe much of the work defendant claimed to be doing because of her advanced age.

Defendant always insisted on payment upfront, and Batterbee never received anything in writing. From September 2014 until April 2015, Batterbee drained her entire life savings to pay for defendant's services. At that point, defendant suggested that Batterbee begin paying him using her credit card. Between April 2015 and May 2015, defendant charged over $18,000 to Batterbee's credit card. At trial, a registered building inspector who assisted the Michigan State Police in its investigation estimated that the repairs done were worth a "[c]ouple hundred dollars." Batterbee's son estimated that Batterbee's home was not worth more than $30,000.

-1-

On appeal, defendant first asserts that the prosecution elicited testimony and made improper comments about his prearrest silence in violation of his right to silence and right to a fair trial. We disagree.[1]

To preserve a claim of prosecutorial error, "a defendant must contemporaneously object and request a curative instruction." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Defendant takes issue with a comment made during the prosecutor's opening statement; the prosecutor said that a trooper "will tell you she made multiple attempts to contact [defendant] to get his side of things and—and was unsuccessful in that endeavor to track him down." Trial counsel did not object to this comment and therefore it is unpreserved. Also, when the prosecution asked the trooper about her investigation, she said: "I attempted to contact [defendant] by phone several times. I left voicemails." Defendant moved for a mistrial following this comment; accordingly, this part of the issue is preserved. See *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501

"The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial (i.e., whether prejudice resulted). Prosecutorial-misconduct issues are decided case by case, and the reviewing court must examine the pertinent portion of the record and evaluate a prosecutor's remarks in context." *People v Abraham*, 256 Mich App 265, 272-273; 662 NW2d 836 (2003) (citations omitted). Unpreserved claims of prosecutorial misconduct are reviewed for plain error. *Callon*, 256 Mich App at 329; *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To avoid forfeiture under the plain-error rule, a defendant must show that an error occurred, the error was plain, and the plain error affected substantial rights. *Id*. at 763. A properly-preserved constitutional question does not require reversal if the prosecution proves that the error was harmless beyond a reasonable doubt. *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008). "A constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *People v Shepherd*, 472 Mich 343, 347; 697 NW2d 144 (2005) (quotation marks, citations, and brackets omitted).

Both the United States Constitution and the Michigan Constitution provide that no person "shall be compelled in any criminal case to be a witness against himself." US Const Am V; Const 1963, art 1, § 17. The privilege against self-incrimination prohibits the introduction of evidence at trial of a criminal defendant's silence. *People v Clary*, 494 Mich 260, 265; 833 NW2d 308 (2013). The privilege encompasses a defendant's silence "in all settings in which

---

[1] Defendant also asserts that he received ineffective assistance of counsel, stating that counsel was ineffective because "evidence of [d]efendant's incarceration had no place in this case." However, there was no indication that defendant was incarcerated and no evidence of incarceration was presented to the jury. This argument was also not raised in defendant's statement of questions presented for appeal; therefore, it need not be considered. MCR 7.212(C)(5); *People v Albers*, 258 Mich App 578, 584; 672 NW2d 336 (2003). Given that there was no mention of incarceration and given the failure to properly present this issue, we decline to address it.

[his or her] freedom of action is curtailed in any significant way . . . ." *People v Schollaert*, 194 Mich App 158, 164; 486 NW2d 158 (1992) (quotation marks and citation omitted). Silence or inaction that occurs outside of custodial interrogation and not in reliance on *Miranda*[2] warnings is not constitutionally protected and may be admitted as substantive evidence. *Id*. at 166-167. In *Schollaert*, law enforcement went to the defendant's home in the early hours of the morning to investigate a murder and the defendant suspiciously did not inquire why the officers were at his home. *Id*. at 160. At trial, the prosecutor elicited testimony and commented during closing arguments on defendant's failure to question the deputy's presence in his home. *Id*. at 160-161. The Court held that even though the defendant was the focus of a police investigation, because he "was not in a custodial interrogation situation where he was compelled to speak or to assert his right to remain silent," his silence was not constitutionally protected. *Id*. at 165-166.

Here, defendant's alleged "silence" was not constitutionally protected at the relevant time because it occurred outside of any custodial interrogation in the initial stages of a police investigation.[3] Reversal is not warranted.

Defendant also argues that the prosecutor denigrated defense counsel, violating his right to a fair trial.

"Generally, prosecutors are accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (quotation marks, citations, and brackets omitted). "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002). A prosecutor need not confine arguments "to the blandest possible terms." *People v Dobek*, 274 Mich App 58, 66; 732 NW2d 546, (2007). If a prosecutor's remarks are in error, reversal is not warranted if the prejudicial effect is cured by a trial court's instruction to the jury. See *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

Prosecutors cannot personally attack the credibility of defense counsel, but are allowed to fairly respond to the defense's arguments. *People v Kennebrew*, 220 Mich App 601, 607-608; 560 NW2d 354 (1996). In *Kennebrew*, during rebuttal the prosecutor stated "that defense

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] To the extent that *People v Bigge*, 288 Mich 417, 420-421; 285 NW 5 (1939), could potentially be interpreted to contradict *Schollaert*, we note that the prosecutor did not, in fact, comment upon defendant's "silence" in this case. During the trooper's testimony, the prosecutor clearly stated that he was simply attempting to set forth the steps of the investigation, and the witness merely said that she had attempted to contact defendant. She did *not* state that she actually reached defendant and he declined to speak to her. Moreover, in his opening statement, the prosecutor again was setting forth the progression of the investigation and merely stated that the trooper was unable to "track [defendant] down." We decline to characterize these circumstances as involving commentary by the prosecutor on defendant's silence.

attorneys often attack the thoroughness of the police investigation as a ploy to convert the case to one against the police." *Id*. at 607. The Court noted that in the abstract, this type of remark could be interpreted as a "general attack" on all defense lawyers, harming the defendant's presumption of innocence and infringing upon his right to a fair trial. *Id*. at 607-608. However, the Court declined to review the remark in "a vacuum" and emphasized the importance of the context. *Id*. at 608. Because the defense attorney had argued that the police had conducted a sloppy investigation, the Court viewed the prosecutor's remark as "no more than a response to this argument." *Id*.

> During rebuttal, the prosecutor in this case said:
>
> I always enjoy the speech about beyond a reasonable doubt and not being sure and whatnot. I think if we went by a defense attorney's idea of what beyond a reasonable doubt is, we'd probably never convict anyone of any crime anywhere because it sounds so unattainable.

While in the abstract this may appear to be a "general attack" on all defense attorneys as perpetually attempting to mislead jurors regarding the required standard of proof, when viewed as a whole it is apparent that the comment was a response to defense counsel's argument. Immediately before the prosecutor's rebuttal, during defense counsel's closing argument, counsel stated:

> [L]et me ask you that when you go to the jury room, you get back there and you go I don't know what that was all about but I'm not—I'm just not sure, if you're not sure, then your only possible verdict is not guilty because if you're not sure, you're not convinced beyond a reasonable doubt.

Viewed in context, the prosecutor's remarks were a response to defense counsel's insinuation that the jurors should be 100% certain that defendant was guilty in order to convict. Because a prosecutor does not need to use the blandest terms in fairly responding to a defense argument, the prosecutor's remarks were reasonable. Moreover, the court cured any possible prejudice by giving instructions on both the proper standard of proof as well as the role of attorney arguments. "Jurors are presumed to follow instructions, and instructions are presumed to cure most errors." *People v Petri*, 279 Mich App 407, 414; 760 NW2d 882 (2008). Consequently, defendant was not denied a fair trial because of the prosecutor's responsive comment.

Next, defendant argues that the trial court abused its discretion in admitting evidence of his previous bad acts. Defendant argues that the prior-acts testimony was the same as "virtually every handyman experience" and it destroyed defendant's chance of a fair trial because of its unfairly prejudicial nature.

We review a trial court's admission of other-acts evidence for an abuse of discretion. *People v Buie*, 298 Mich App 50, 71; 825 NW2d 361 (2012). An abuse of discretion occurs when "the trial court [chooses] an outcome that is outside the range of principled outcomes." *People v Schaw*, 288 Mich App 231, 236; 791 NW2d 743 (2010). If a trial court's decision to admit evidence "involves a preliminary question of law, such as whether a statute or rule of

evidence precludes admissibility of the evidence, the issue is reviewed de novo." *Buie*, 298 Mich App at 71 (quotation marks and citations omitted).

"[A]lthough evidence of character might very well be relevant to a fact at issue, the rules of evidence strictly limit both the circumstances under which character evidence may be admitted and the types of character evidence that may be admitted." *People v Roper*, 286 Mich App 77, 91; 777 NW2d 483 (2009). Generally, evidence of prior bad acts as evidence of a person's character is inadmissible to prove a person's propensity to act in conformance with that character trait. MRE 404(b)(1). This is to avoid convictions based on a defendant's past misconduct. *People v Starr*, 457 Mich 490, 494-495; 577 NW2d 673 (1998).

However, under MRE 404(b)(1), "[e]vidence of other crimes, wrongs, or acts is . . . admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident . . . ." In order for other-acts evidence to be admissible, the proponent must demonstrate (1) that the evidence is offered for a proper purpose, (2) that it is relevant to a fact of consequence, and (3) that the danger of unfair prejudice does not substantially outweigh its probative value. *People v Pinkney*, 316 Mich App 450, 475-476; 891 NW2d 891 (2016). Notably, "MRE 404(b) is a rule of inclusion, not exclusion." *Id*. at 475. As long as evidence is offered for a noncharacter purpose, it is admissible even if it reflects on the person's character. *People v Mardlin*, 487 Mich 609, 615; 790 NW2d 607 (2010).

Before trial, the prosecution notified the court of its intention to call Sally Cummings, a prior customer of defendant's, to testify about her experience with defendant's handyman service. The court deemed the testimony admissible. At trial, Cummings testified that she had also paid defendant up front by check and that after she hired him, defendant continued finding various jobs that he offered to do for her. However, each job that defendant performed was done incorrectly. After Cummings began asking defendant for receipts he "left and never came back," although she had paid him in advance for work he did not complete. Cummings sued defendant in small claims court.

Cummings' testimony was properly admitted pursuant to MRE 404(b). First, the evidence was offered for a proper purpose. A proper purpose is one other than showing that a defendant has a propensity to commit similar bad acts. See *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993), amended on other grounds 445 Mich 1205 (1994). Here, Cummings' testimony was introduced to prove defendant's intent, or his common scheme of defrauding customers, not just that he had a propensity to cheat his customers. *Pinkney*, 316 Mich App at 474-475. Both are proper purposes under MRE 404(b). Second, the evidence was relevant. Evidence is only admissible if it is relevant, meaning it has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. To prove larceny by false pretenses, the prosecution must show that a defendant intended to defraud or cheat the victim. MCL 750.218(1). Accordingly, proving that defendant intended to defraud or cheat Batterbee was a fact of consequence in defendant's trial. *Pinkney*, 316 Mich App at 475. Cummings' testimony that she had a similar encounter with defendant, where he cheated her by performing substandard work and refusing to provide her with documentation until he completely disappeared, made it more likely that defendant also *intended* to cheat Batterbee in the same

manner, or that this was a *common scheme or plan* of his. Third, the testimony was not unfairly prejudicial. Even when evidence is relevant, it may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." MRE 403. All relevant evidence is prejudicial to some extent, but evidence is *unfairly* prejudicial if it creates a danger that marginally probative evidence might be given undue weight by the jury. *People v Feezel*, 486 Mich 184, 198; 783 NW2d 67 (2010). The determination whether the probative value of the evidence is substantially outweighed by its prejudicial effect is best left to the trial court's contemporaneous assessment. See *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009). Defendant's theory of the case was that Batterbee made "bad choices" and had a "lack of business judgment." The other-acts evidence was probative of his intention and recurring pattern of defrauding his customers, and because defendant had acted similarly before, it tended to negate his insinuation that this was an isolated incident during which an elderly woman made a bad business decision. Thus, Cummings' testimony was not unfairly prejudicial in light of its high probative value. MRE 403.

Next, defendant raises a host of errors in relation to his sentencing. First, he argues that his sentence was based on unsupported facts. We disagree.

Under the Crime Victim's Rights Act (CVRA), MCL 780.751 *et seq.*, the victim of a crime has the statutory right to submit an impact statement. A crime victim is given wide latitude in making his or her impact statement, see, generally, *People v Steele*, 173 Mich App 502, 505; 434 NW2d 175 (1988), and the victim may include "[a]n explanation of the nature and extent of any physical, psychological, or emotional harm or trauma suffered by the victim," MCL 780.763(3)(a). This impact statement may be included in the presentence investigation report (PSIR), MCL 780.764, and the trial court may consider the PSIR when imposing a sentence, *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). Information contained in the PSIR is presumed accurate unless a defendant raises an effective challenge. *People v Grant*, 455 Mich 221, 233-234; 565 NW2d 389 (1997).

Defendant argues that Batterbee's fear was financial in nature and that the trial court's finding during sentencing that Batterbee experienced "fear of physical reprisal" was inaccurate. In her victim impact statement, Batterbee stated, "I am in fear[.]" Further, a statement prepared by Batterbee's daughter on Batterbee's behalf indicated that Batterbee "suffered sleepless nights in fear [that defendant] would come to finish her off so no trial would be held." Accordingly, the court did not err in finding that the victim was in fear of physical danger from defendant.

Next, defendant argues that offense variable (OV) 4 was improperly scored. We review de novo whether the lower court's factual determinations were sufficient to assess points for an OV. *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016). OV 4 concerns psychological injury to a victim, and the court is to score it at 10 points if the defendant's crime caused the victim "[s]erious psychological injury requiring professional treatment . . . ." MCL 777.34(1)(a). A victim's expression of fearfulness or anger can constitute sufficient evidence of psychological injury. See *People v Williams*, 298 Mich App 121, 124; 825 NW2d 671 (2012).

Defendant argues that Batterbee was only upset at her financial losses, and disputes that she suffered any psychological injuries. However, the record, especially the PSIR, supports that Batterbee suffered psychological injury. As discussed above, Batterbee stated that she was "in

fear" and outlined that she "suffered sleepless nights in fear [that defendant] would come to finish her off so no trial would be held." Batterbee also explained that she felt "[d]isappointment and emotional pain" and that she was seeking counseling with her reverend. Accordingly, there was ample evidence to support the scoring of OV 4 at 10 points.

Next, defendant argues that restitution was calculated erroneously. We review a trial court's factual findings in calculating restitution for clear error. See, generally, MCR 2.613(C). We review an order of restitution for an abuse of discretion. *People v Gubachy*, 272 Mich App 706, 708; 728 NW2d 891 (2006). Questions of statutory interpretation are reviewed de novo. *Id.*

Crime victims have a constitutional right to restitution, Const 1963, art 1, § 24, as well as a statutory right, MCL 780.766; MCL 769.1a. "The purpose of restitution is to allow crime victims to recoup losses suffered as a result of criminal conduct." *People v Newton*, 257 Mich App 61, 68; 665 NW2d 504 (2003) (quotation marks and citation omitted). A "victim" includes a person who suffers financial or emotional harm as a result of the commission of a crime. MCL 780.766(1). When a defendant is convicted of a crime, "the court shall order . . . that the defendant make full restitution to any victim of the defendant's course of conduct . . . ." MCL 780.766(2). Full restitution means that the restitution is "complete and maximal." *People v Garrison*, 495 Mich 363, 365; 852 NW2d 45 (2014). There must be a "direct, causal relationship between the conduct underlying the convicted [sic] offense and the amount of restitution to be awarded." *People v Corbin*, 312 Mich App 352, 360; 880 NW2d 2 (2015), citing MCL 780.766(2) (quotation marks and citation omitted).

Although the court did not hold a separate restitution hearing, it did make findings of fact on the record at defendant's sentencing. While the CVRA requires a hearing, it does not require a hearing that is specifically aimed at calculating restitution. *Grant*, 455 Mich at 234-235. At sentencing, defendant emphasized that some of the money Batterbee gave him was a gift, and that the amount of restitution recommended in the PSIR did not contemplate the labor or materials that went into the work done to Batterbee's house. However, the prosecutor explained that evidence at trial showed the amount of money defendant defrauded Batterbee out of and reiterated that the residential-building-inspector expert opined that the work actually performed was under $1000 worth of work. Ultimately, the court said it was ordering restitution in the amount requested by the prosecution based on evidence presented at the trial, $96,303 to Batterbee and $18,529.36 to Discover.

Defendant argues that the prosecution had to prove beyond a reasonable doubt any restitution beyond what was authorized by the jury's verdict. This is incorrect. The court calculates restitution based on the actual loss suffered by the victim, *People v Fawaz*, 299 Mich App 55, 65; 829 NW2d 259 (2012), which must be supported by the evidence, *People v Cross*, 281 Mich App 737, 738; 760 NW2d 314 (2008). When the amount of restitution is in dispute, the prosecution has the burden of proving by a preponderance of the evidence the amount of the victim's loss. MCL 780.767(4). A " '[p]reponderance of the evidence' means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth." *Cross*, 281 Mich App at 740.

Here, defendant was charged and found guilty of larceny by false pretenses involving more than $50,000 but less than $100,000. Therefore, this amount was clearly proven by more

than a preponderance of the evidence. Further, at trial the prosecutor introduced evidence of all of the checks that Batterbee wrote to defendant, as well as her credit-card statements, which showed charges attributable to defendant. While defendant argued that there was a loan made to him, there was no check or credit card transaction for $2,500 or $2,800 (the amount of the alleged loan) admitted at trial. Further, there was no evidence that this amount was added to the amount of restitution ordered. Additionally, although defendant argues that he should recoup the funds that he allegedly spent on making repairs to Batterbee's home, the expert at trial estimated that the total amount of work that he saw amounted to a only a "couple hundred" dollars. Weighing the prosecutor's concrete evidence, including bank and credit-card statements, with defendant's unsupported assertions, it was not clear error for the trial court to resolve that dispute in favor of the prosecution, determining that the amount suggested by the prosecutor had "more convincing force and the greater probability of truth." *Id*.

Defendant next argues that resentencing is required because his departure sentence was unreasonable. "A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017).

Although not mandatory, sentencing guidelines "remain a highly relevant consideration in a trial court's exercise of sentencing discretion." *Lockridge*, 498 Mich at 391. Sentencing guidelines provide guideposts to assist the trial court in minimizing disparate sentences between offenders with similar characteristics who commit similar offenses. See *People v Dixon-Bey*, ___Mich App ___; ___ NW2d ___ (2017) (Docket No. 331499); slip op at 18. "The relevant question for appellate courts reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the principle of proportionality[.]" *Dixon-Bey*, ___Mich App at___; slip op at 16 (quotation marks and citation omitted). The trial court must consider both the nature of the offense and the background of the offender when sentencing a defendant. See *Steanhouse*, 500 Mich at 472 (discussing the principle of proportionality). Factors that a trial court should consider in accordance with the principle of proportionality are:

> (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expression of remorse, and the defendant's potential for rehabilitation. [*People v Steanhouse*, 313 Mich App 1, 46; 880 NW2d 297 (2015), rev'd in part on other grounds by *Steanhouse*, 500 Mich at 453 (citations omitted).]

Defendant's sentencing guidelines range was calculated at 29 to 85 months. Defense counsel requested that defendant be sentenced at the low end of the range because defendant has a family and would need to work in order to pay the ordered restitution. The prosecution requested that the court exceed the guidelines and impose no less than a 15-year minimum sentence. Ultimately, the court departed from the guidelines and the prosecution's recommendation and sentenced defendant to a minimum of 17 years (204 months).

The trial court was acutely aware that its decision would be reviewed for reasonableness on appeal. During sentencing it underwent a lengthy analysis in order to determine "what distinguishes . . . defendant from other defendants who may have been found guilty of the same crime." In imposing the upward departure, the court reasoned:

[The] [c]ourt indicates that the first thing is he's done it before. The testimony of Sally Cummings indicated that the defendant had defrauded her in much the same way that he defrauded Mrs. Batterbee[.]

\* \* \*

[Defendant] then met up with Mrs. Batterbee and engaged in a—in a continuous bilking of Mrs. Batterbee from October of 2014 until May 2015 when he had essentially exhausted all of her resources.

The testimony established that Mrs. Batterbee was a fiercely independent woman who had raised her children as a single working mother in her beloved home in Fairgrove.

And so she had contacted the defendant to get bids on some minor maintenance work. . . . And as soon as the defendant got to her house, he started to go to work on her. He indicated she needed a new roof. When she indicated that she had already hired a contractor, [defendant] engaged in a disparagement of that contractor that had already been hired and then gets himself the roof job, which was never completed, and then continuously for this period of time engaged in numerous meaningless repairs and continuous demands for payment from Mrs. Batterbee.

And during the same time that this is going on, [defendant] engaged in and developed a relationship with this elderly woman where he engaged in calling her mother or mom and he—and she called him son. It was that close of a relationship which obviously had been perpetrated by [defendant] for the purpose of perpetuating his scheme here.

He had almost daily contact with Mrs. Batterbee, continually developing his familial relationship with her. Brought the kids into the relationship, brought meals to her. Discussed his family problems, his financial stressors, health problems that may or may have not existed. It was questionable on the record as to whether or not those illnesses that he had indicated to Mrs. Batterbee even existed. He continuously preyed on her Christian—strong Christian faith and her sympathies.

This pattern continued up to and after Mrs. Batterbee had completely exhausted her approximately $100,000 in life savings, only then to continue with a credit card—putting charges on a credit card in the amount of $18,000.

The evidence was clear that much of the work was not done or, if it was done, it was in such a shoddy and unprofessional manner that it is of no consequence that it was done.

Some of the most appalling testimony came from Mrs. Batterbee's son who indicated that the home best case scenario was probably worth between 30 and $40,000. However, the defendant managed to talk Mrs. Batterbee into repairs of in excess of $100,000.

The sentence guidelines put this offense in the property category. *This, however, does not take into consideration the systematic and ruthless nature of the victimization of Mrs. Batterbee.* Her life savings are completely depleted. The defendant, who receives social security SSI benefits, has no legal means by which he will ever be able to pay her back. This is the obvious property loss. However, it goes so much deeper than that.

Mrs. Batterbee's home which she has always taken so much pride in is now arguably in a worse state of repair than it was when she started paying the defendant for his services. *The emotional worry and upset that were caused by the $18,000 charged on the credit card which Mrs. Virginia had no means to pay is—is immeasurable and certainly was not taken into consideration as it relates to the guidelines calculation.*

Even after discovery, the defendant tried to force a wedge between Mrs. Batterbee and her children, indicating to her that somehow the victim's children were simply concerned about their, quote, inheritance. Obviously this was not the case, but the assertion in and of itself was the infliction of an emotional injury not to mention that this proud lady who has lived frugally her entire life most likely will be unable to leave anything for her children due to the defendant's actions.

Most importantly, the defendant stole this proud, independent lady's peace of mind at the age of 87. Having lived a frugal existence, she was now in fear of financial doom. More importantly, she was in fear of physical reprisal from the defendant as set forth in the victim impact statement, such fear which would have never had a place in this lovely lady's life but for the interjection of the defendant.

And so for the reasons the [c]ourt has set forth on the record, the [c]ourt finds that a reasonable and proportional sentence taking all of these factors into consideration I have already mentioned but must also provide [the victim] with peace to live out her last days with the assurance that the defendant is incarcerated for that entire period of time and cannot cause her any physical harm. [Emphasis added.]

The trial court correctly acknowledged that this was not a "typical" false-pretenses case. Defendant fostered an extremely close relationship with the victim, to the point where he called her "mother." The PSIR notes that he attempted to drive a wedge between the victim and her actual children and also used her Christian faith to prey on her sympathies. In addition,

defendant *depleted* the victim's life savings and has no reasonable chance of repaying her. While "exploitation of a vulnerable victim" is taken into account by OV 10 of the sentencing guidelines, see MCL 777.40, the trial court essentially, and correctly, concluded that the exploitation here was of a particularly egregious nature. Implicit in the trial court's findings was that the scoring of OV 10 was not adequate to account for the devastation inflicted upon the victim by defendant and the manner in which he inflicted it. In addition, while, as discussed above, the guidelines took into account psychological injury to the victim (by way of OV 4), the trial court, again, implicitly found that the scoring of OV 4 was inadequate to account for the "emotional worry and upset" caused to the victim, who was left in a state of financial ruin after being frugal her entire life and building up a savings account.

The trial court noted that, in addition to stealing money, defendant stole the victim's peace of mind. The trial court emphasized that the victim had been systematically and ruthlessly victimized.

We acknowledge that the departure from the guidelines was substantial. But this was not a "run-of-the-mill" fraud case. The victim was preyed upon in a particularly egregious manner and was left in a state of financial ruin and emotional turmoil. Under the circumstances, we cannot find that the trial court abused its discretion in applying the principle of proportionality.

Finally, in defendant's Standard 4 brief he argues that his sentence was based on inaccurate information because he was sentenced as a third-offense habitual offender but his PSIR states that he has one prior felony conviction.

MCL 769.11 states:

> If a person has been convicted of any combination of 2 or more felonies or attempts to commit felonies . . . and that person commits a subsequent felony within this state, the person shall be punished upon conviction of the subsequent felony and sentencing under section 13 of this chapter as follows . . . .

MCL 769.13(1) explains that a prosecutor may seek to enhance a defendant's sentence based on his or her status as an habitual offender. The existence of a prior conviction is determined by the court by using, among other things, the PSIR. MCL 769.13(5). The defendant has the burden of establishing that a prior conviction is inaccurate or constitutionally invalid. MCL 769.13(6). Under the Michigan habitual-offender laws, each prior felony conviction is counted separately, even if the convictions arose from the same conduct. *People v Gardner*, 482 Mich 41, 44; 735 NW2d 78 (2008).

While defendant is correct that page 1 of his PSIR reflects only one previous felony, it appears that this was a clerical error. Before trial, the prosecution provided defendant and the court notice of its intention to enhance defendant's sentence as a third-offense habitual offender. Nowhere in the record did defendant or his counsel dispute this. The convictions contained in the notice are consistent with the felony convictions reflected in the "Criminal Justice" section of defendant's PSIR, which indicates that defendant was previously convicted by nolo contendere plea of resisting and obstructing a police officer, MCL 750.81d(1), and attempting to resist and obstruct a police officer, MCL 750.81d(1). Accordingly, defendant's current felony conviction

is his third felony conviction and the trial court scored defendant's guidelines in accordance with his status as a third-offense habitual offender to reflect a guidelines range of 29 to 85 months. He is not entitled to resentencing for a clerical and harmless error. See, generally, *Carines*, 460 Mich at 763-764.

Affirmed.

/s/ Michael J. Talbot
/s/ Patrick M. Meter
/s/ Jonathan Tukel